**EXHIBIT A**

16922N:091861:839150:2:NASHVILLE

# SOURCING AGREEMENT

This Sourcing Agreement (the "Agreement") made this __ day of _____, 200[ ] between HL Operating Corp., a Delaware corporation d/b/a Hartmann, having its principal place of business at 1301 West Baddour Parkway, Lebanon, TN 37087 ("Hartmann"), and Johnson Associates Corporation, a company organized and existing in good standing under the laws of Republic of China, ROC and having its principal place of business at 2Fl., No 162 Songjiang Road, Taipei, Taiwan ("Vendor"). The parties agree as follows:

**1.    APPOINTMENT.**    Hartmann hereby engages Vendor as a non-exclusive manufacturer of Hartmann-branded luggage and leather products (hereinafter referred to as the "Ware") as and when ordered by Hartmann from time to time. In addition to the terms and conditions set forth in this Agreement, Vendor agrees to comply with the terms and conditions of each Purchase Order that may be issued by Hartmann from time to time, as well as all of the Schedules that are attached hereto.

**2.    DELIVERY & PAYMENT.**

**(a)**    Vendor agrees that time is of the essence with respect to the delivery dates set forth in the Purchase Orders for the Ware. However, Vendor shall not be liable for delays resulting from acts of God, including floods and fire, or from acts of foreign nations, strikes, civil or military authority, insurrection or riot, or embargoes;

**(b)**    Quantities set forth in the Purchase Orders are "make-to-order" quantities only. If the Vendor believes that it may exceed the quantity stated in any Purchase Order it must contact Hartmann for Hartmann's prior written approval. Any orders shipped 10 days after the confirmed ex-factory dates without any prior notice and an explanation from Johnson Associates Corporation that is acceptable in Hartmann's reasonable judgment constitute a "Delayed Shipment". Johnson Associates Corporation agrees to the following penalty terms in case of a Delayed Shipment:

> ➤ Delay of at least ten (10) days but less than three (3) full weeks: Shipped by ocean freight collect with 2% discount on the FOB of the delayed goods.
> ➤ Delay of at least three (3) full weeks but less than four (4) full weeks: Shipped by ocean freight collect with 4% discount on the FOB of the delayed goods.
> ➤ Delay of four (4) full weeks or more: Shipped by airfreight prepaid..

Any orders that are not shipped within five weeks of the confirmed and agreed to ship date as stated in the Purchase Order may, at Hartmann's sole option, be cancelled, in which case Hartmann shall have no liability to Vendor. In the event of such cancellation, Vendor shall, if Hartmann so requests, destroy the Ware subject to the Purchase Order and provide Hartmann with a certificate of destruction.

**(c)**    The basic business terms of each order, including pricing, payment and delivery terms, are set forth in **Schedule 2.0**, which is attached hereto and made a part hereof.

EXHIBIT

_A_

3.    *PRODUCT SPECIFICATIONS, QUALITY REQUIREMENTS & SAMPLES.*

(a)    Vendor shall ensure that each and every unit of the Ware will strictly conform to the Hartmann General Quality Specifications, a copy of which is attached hereto and made a part hereof as **Schedule 3.0**, and any specific quality specifications set forth in the Purchase Order relating to such unit of the Ware.

(b)    Prior to commencement of production, Vendor shall manufacture, and make available to Hartmann for inspection at Vendor's factory, samples of the Ware, including product, collateral material and packaging, that, in addition to meeting the Hartmann General Quality Specifications, meet quality standards acceptable to Hartmann. Upon written approval of such samples by Hartmann, the approved samples shall constitute the standards against which all Ware, including collateral material and packaging produced by Vendor, will be evaluated (the "Approved Sample(s)"). Vendor shall produce the Ware in strict conformance with the Approved Sample(s) and shall ship only such conforming Ware to Hartmann.

(c)    In the event Vendor does not comply with the Hartmann General Quality Specifications and/or the Approved Samples, Vendor expressly agrees that Hartmann may issue "charge backs" to Vendor, and that Vendor shall compensate Hartmann for such "charge backs" through direct payment and/or credits, at the option of Hartmann. The issuance of such "charge backs" to Vendor shall be at the option of Hartmann and shall not limit any other rights that Hartmann may have pursuant to this Agreement or at law.

(d)    Hartmann may, at its option, in respect of a particular item of Ware in any Purchase Order, accept "Second Quality Ware", as such term is defined below; provided that the price for any such Second Quality Ware shall be between seventy-five percent (75%) and eighty-five percent (85%) of the price for the relevant Ware as stated in the Purchase Order, to be mutually determined by Hartmann and Vendor for each item of Second Quality Ware after taking into account the condition of, and the severity of the defects in, such Second Quality Ware. Second Quality Ware shall be defined as Ware having any slight cosmetic defect but no defects that adversely affect the Ware's function ("Functional Defects"). Second Quality Ware includes, but shall not be limited to, products that have pocket misalignment, variation in fabric shade, a puckered or wrinkled appearance, broken leather, or a wavy zipper. Second Quality Ware must function properly and be free of all Functional Defects. Functional Defects include, but shall not be limited to, zip slides that do not zip closed, retractable handles that do not raise, lower, and/or lock, or visible holes in the product. Hartmann will not accept, and shall have no liability for, any Ware with Functional Defects ("Defective Ware"). At its option, Hartmann may return all Defective Ware to the Vendor for repair, all at Vendor's expense. Alternatively, Hartmann may repair such Defective Ware, which shall, upon its complete repair, be deemed to be purchased by Hartmann for a price equal to the price for such Ware as stated in the Purchase Order less any and all expenses associated with the repair of such Defective Ware. Non-repairable items not purchased by Hartmann shall be destroyed at the Vendor's expense, and Vendor shall provide Hartmann with a certificate of destruction for all such items, including therein a certification that destruction has occurred in compliance with all applicable environmental laws.

(e)    In the event that Hartmann's inspection of a sample consisting of the number of units of an item of Ware corresponding to the size of the lot (as noted on the Acceptable Quality Level 2.5 table (the "AQL 2.5") attached hereto as **Schedule 3.1**) of such item of Ware on any Purchase Order shows that the number of such sample that consists of Defective Ware is equal to

Case 3:09-cv-01206   Document 1-1   Filed 12/22/09   Page 3 of 23 PageID #: 8

or greater than the number in the "Reject" column of the AQL 2.5 for the relevant lot size, then Hartmann may, in each case at its option: (i) if such inspection takes place prior to delivery of the Ware, cancel such Purchase Order without any liability to Vendor therefor; (ii) if such inspection takes place following delivery of but prior to payment of the purchase price of such Ware, return all or any portion of such Ware to Vendor, at Vendor's expense and without any liability to Vendor therefor, or instruct Vendor to replace all or any portion of such Ware; and (iii) if such inspection takes place following delivery and after payment of the purchase price of such Ware, return all or any portion of such Ware to Vendor, at Vendor's expense, obtain a refund from Vendor of, or credit for, the portion of the purchase price paid in respect of such returned Ware, or, instruct Vendor to replace, at Vendor's expense, all or any portion of such Ware.

4.  **SHIPPING/RECEIVING PACKAGING INSTRUCTIONS & REQUIREMENTS.**
The Ware shall be packaged and shipped in conformance with the then-current Hartmann Shipping/Receiving Packaging Instructions & Requirements relating to such Ware, a copy of which shall be delivered by Hartmann to Vendor from time to time. In the event Vendor does not comply with the provisions of such Shipping/Receiving Packaging Instructions & Requirements, Vendor expressly agrees that Hartmann may issue "charge backs" to Vendor in an amount equal to the cost of correcting the deficiency in Vendor's compliance with such Shipping/Receiving Packaging Instructions & Requirements, and that Vendor shall compensate Hartmann for such "charge backs" through direct payment and/or credits, at the option of Hartmann. The parties acknowledge that these "charge backs" are only available to Hartmann to the extent that Vendor has not complied with the Shipping/Receiving Packaging Instructions & Requirements. The issuance of such "charge backs" to Vendor shall be at the option of Hartmann and shall not limit any other rights that Hartmann may have pursuant to this Agreement or at law.

5.  **INSPECTION OF THE WARE.**

    **(a)**    Vendor shall make the Ware available for Hartmann's inspection at its factory prior to shipment pursuant to any particular Purchase Order. Vendor shall give Hartmann, or Hartmann's designated representative, written notice that the Ware is ready for inspection and shall permit Hartmann, and/or its designated representative, access to its factory for inspection during regular business hours.

    **(b)**    Whether or not Hartmann conducts an inspection of the Ware as described in Section 5(a), Hartmann shall have the opportunity to inspect and reject the Ware following delivery of such Ware to Hartmann or Hartmann's customers and accounts, as the case may be. In the event that such inspection shows that the Ware does not comply with the Hartmann General Quality Specifications or the Shipping/Receiving Packaging Instructions & Requirements applicable to such Ware, or otherwise does not conform to the quality standard of the Approved Sample(s), Vendor expressly agrees that Hartmann may issue "charge backs" to Vendor in an amount equal to the cost of correcting the deficiency in the Ware's compliance with the Hartmann General Quality Specifications and the Shipping/Receiving Packaging Instructions & Requirements, and that Vendor shall compensate Hartmann for such "charge backs" through direct payment and/or credits, at the option of Hartmann. The parties acknowledge that these "charge backs" are only available to Hartmann to the extent that the Ware does not comply with the Hartmann General Quality Specifications and the Shipping/Receiving Packaging Instructions & Requirements. The issuance of such "charge backs" to Vendor shall be at the option of Hartmann and shall not limit any other rights that Hartmann may have pursuant to this Agreement or at law.

Case 3:09-cv-01206   Document 1-1   Filed 12/22/09   Page 4 of 23 PageID #: 9

## 6. WARRANTIES, REPRESENTATIONS, COMPLIANCE WITH LAWS.

**(a)**     Vendor warrants and represents that: (i) the Ware shall strictly conform to the Hartmann General Quality Specifications and Approved Sample(s) standards respectively set forth in Schedules 3.0 and Section 3(b) hereof; (ii) the Ware shall be free of defects in material and workmanship and fit for its intended purpose; (iii) Vendor is not a party to any agreement which restricts its performance under this Agreement; (iv) Vendor's business and each and every unit of the Ware is and will be in full and complete compliance with all applicable foreign and United States laws, regulations, requirements and standards, including, but not limited to, placing the proper country of origin labels on the Ware; and (v) the Ware will be free from any claim, encumbrance or lien.     Vendor shall sign and comply with the requirements set forth in Hartmann's Workplace Code of Conduct, which is set forth in **Schedule 6.0,** attached hereto and made a part hereof.

**(b)**     To the extent Vendor has designed the Ware or any portion thereof, Vendor warrants and represents  that such designs do not violate or infringe any copyrights, patents, trade secrets, concepts or ideas of any other party.

## 7. MANUFACTURING COSTS.

**7.     MANUFACTURING COSTS.**     All manufacturing and engineering costs relating to the production of the Ware shall be the sole responsibility of Vendor. In addition, unless otherwise agreed to in writing by the parties, and except for the cost of manufacturing the specific tooling and molds identified on **Schedule 7.0** attached hereto, which may be amended from time to time by the mutual agreement of the parties hereto, Vendor shall be responsible for the costs related to the manufacture of the tooling and molds used for the production of the Ware (the "Tooling"). Vendor expressly agrees that it shall not use, and shall not permit any third party to use, the Tooling for any purpose other than the production of the Ware for Hartmann. Upon the expiration or termination of this Agreement, or upon thirty (30) days prior written notice to Vendor by Hartmann, Vendor shall destroy the Tooling at its own expense, or, at Hartmann's sole option, return the Tooling to Hartmann at Hartmann's expense. In the event that Hartmann does not elect to have the Tooling returned to Hartmann and Vendor destroys such Tooling, Vendor shall provide Hartmann with a certificate of destruction, including therein a certification that destruction has occurred in compliance with all applicable environmental laws.

## 8. CONFIDENTIALITY.

**8.     CONFIDENTIALITY.**     Vendor will maintain confidentiality of all of Hartmann's specific design ideas and/or manufacturing processes. At no time can any aspect of Hartmann's designs, documentation or processes be shared, provided, or sold to any party without previous written permission of Hartmann.

In addition, Vendor agrees that there shall be no display of Hartmann trademarks, designs, prototypes, or the Ware in the factory or factory showrooms of Vendor (or, in the event that Vendor has subcontracted any phase of production of the Ware pursuant to Hartmann's express written consent obtained in accordance with Section 13(d) hereof, in the factory of any subcontractor) without Hartmann's express prior written consent.

9. **HARTMANN INTELLECTUAL PROPERTY.**

(a)      Vendor acknowledges that Hartmann is the sole and exclusive owner worldwide of all right, title and interest in and to the Hartmann name, all trademarks used by Hartmann and all designs for the Ware, including, but not limited to, all copyrights, trade dress, trade secrets, product formulations owned or used by Hartmann and patent rights (collectively, the "Hartmann Intellectual Property"), and that all uses of the Hartmann Intellectual Property shall inure solely to the benefit of Hartmann.

(b)      Vendor warrants and represents that it: (i) shall never use or register the Hartmann Intellectual Property for itself or for any other person or business; (ii) shall not manufacture, directly or indirectly, any products substantially similar to the Ware except for delivery to Hartmann pursuant to a Purchase Order issued under this Agreement; and (iii) shall not, directly or indirectly, by any act or omission, in any way impair Hartmann's rights in and to the Hartmann Intellectual Property.

(c)      Vendor acknowledges that any breach of the requirements contained in this Section 9 will cause substantial and irreparable damage to Hartmann. .

10. **INDEMNIFICATION & INSURANCE.**

(a)      Vendor shall defend, indemnify and hold Hartmann harmless from and against any loss, liability or expense, including, but not limited to, reasonable attorneys' fees, which Hartmann may suffer or become liable for as a result of any claim or action arising out of Vendor's operations, including without limitation production and supply of the Ware, and/or Vendor's breach of any of its obligations under this Agreement, including without limitation any breach of any representation or warranty.

(b)      Vendor's indemnity obligations as set forth in this Section 10 shall continue in full force and effect, notwithstanding the expiration or termination of this Agreement, (i) in the case of indemnity obligations arising as a result of a breach of the representations, warranties and covenants contained in Section 8 and Section 9 of this Agreement, indefinitely, and (ii) in the case of all other indemnity obligations, for two (2) years from the expiration or termination of this Agreement.

11. **TERMINATION.**

(a)      This Agreement shall terminate on the date two (2) years after the date of its commencement as set forth above, unless (i) renewed in writing by Hartmann for another term of two years, or such other term as Hartmann may in its sole and absolute discretion specify, prior to such date, or (ii) earlier terminated in accordance with the provisions of Section 11(b) or Section 11(c) of this Agreement.

(b)      If either party breaches any of its obligations under this Agreement and such breach is not cured within ten (10) days of the breaching party's receipt of written notice of such breach from the non-breaching party, the non-breaching party may terminate this Agreement at any time thereafter that such breach remains uncured.

Case 3:09-cv-01206   Document 1-1   Filed 12/22/09   Page 6 of 23 PageID #: 11

(c)     In addition to its rights pursuant to Section 11(b) of this Agreement, either party may terminate this Agreement, without cause, by giving one hundred twenty (120) days prior written notice to the other party. In the event that Hartmann terminates this Agreement without cause, Hartmann shall accept delivery, subject to its rights hereunder, of the Ware delivered under any Purchase Order submitted and in process of being manufactured as of the date of issuance of Hartmann's notice of termination.

(d)     In the event that Hartmann terminates this Agreement either in accordance with the provisions of Section 11(b) or Section 11(c) of this Agreement, Vendor shall be obligated, if Hartmann so requests, to fill all Purchase Orders issued prior to the termination date.

(e)     Hartmann shall have no liability whatsoever to Vendor by reason of Hartmann's termination of this Agreement in accordance with the provisions of either Section 11(b) or Section 11(c) of this Agreement, except in respect of Ware delivered by Vendor to Hartmann under the terms of a Purchase Order issued by Hartmann prior to the termination date. Hartmann shall also purchase from Vendor, at Vendor's cost, any raw material of the type described on **Schedule 11.0** attached hereto, which schedule may be amended from time to time by the mutual agreement of the parties hereto, purchased by Vendor as part of an order by Vendor of the minimum quantity of such raw material it could order from its supplier. In respect of such Wares, Hartmann shall, after giving effect to whatever credits may be owed to it, and in the case of a breach by Vendor, also after giving effect to whatever damages or claims it has under the Agreement, make payment in accordance with, and to the extent required by, such Purchase Order and this Agreement.

## 12.     *NON-SOLICITATION.*

(a)     Neither party shall, without first obtaining a written consent, during the term of this Agreement and for one year after the termination (for whatever reason) of this Agreement, either directly or indirectly, (i) induce or attempt to induce any person who is at the time in question an employee of the opposite party to terminate his or her employment, or (ii) employ any person who is at the time or was during the preceding year employed by the opposite party.

(b)     It is agreed that, if any of the foregoing restrictions are found by a court of law or equity, administrative agency, governmental or quasi-governmental tribunal, or comparable body with the authority to render and enforce judgments with respect to this Agreement (each of the foregoing, a "Court") to be overly broad or otherwise unreasonable, the Court shall have the authority to reform the agreement and to enforce the restrictions to the fullest extent found by the Court to be reasonable in light of all of the circumstances. If a part of this Section 12 is found to be invalid or unenforceable for any reason, the remaining part shall not be void, but shall remain in effect and shall be fully enforceable without regard to those portions found to be invalid. It is further agreed that, should either party be found to have violated these restrictions, the one year period referred to in Section 12(a) above applicable to such party shall be extended by any length of time during which such party was in violation hereof, including any time during which litigation was pending to establish such party's violation.

(c)     Both parties recognize that irreparable harm could result to each other if any of the covenants of Section 12 were breached. Each party shall have the right, therefore, in addition to and not in lieu of all other remedies which may be available at law or in equity, to apply to any Court of competent jurisdiction to restrain, temporarily and permanently, the other party from violating any of the provisions of this Section 12.

Case 3:09-cv-01206   Document 1-1   Filed 12/22/09   Page 7 of 23 PageID #: 12

## 13. *MISCELLANEOUS.*

**(a)** This Agreement, including all Schedules hereto, shall be interpreted in accordance with the laws of the Hong Kong Special Administrative Region of the People's Republic of China ("Hong Kong"), without regard to the United Nations Convention on Contracts for the International Sale of Goods, contains the entire agreement between the parties with respect to the subject matter hereof, supersedes all prior oral or written agreements, and may not be modified unless agreed upon in writing by both parties. Notwithstanding the foregoing, any and all Schedules hereto may be amended by Hartmann upon reasonable advance written notice to Vendor. Vendor hereby irrevocably consents that any legal action or proceeding against it or any of its assets under this Agreement may be brought, as Hartmann may elect, in any court located in Hong Kong, and Vendor shall appoint, and maintain for the term of this Agreement, an agent for service of process in Hong Kong. Alternatively, if Hartmann so elects, any dispute, controversy or claim arising out of our relating to this Agreement shall be settled by arbitration in Hong Kong under the UNCITRAL Arbitration Rules in accordance with the Hong Kong International Arbitration Centre Procedures for the Administration of International Arbitration in force as of the date of this Agreement.. The language to be used in any such arbitral proceedings shall be English.

**(b)** All notices under this Agreement shall be in writing and shall be sent by reputable express courier to the party to whom the notice is directed at its address as set forth in this Agreement.

**(c)** Nothing contained herein shall constitute the parties as partners, joint venturers or as agent of the other. Vendor is an independent contractor and can only obligate Hartmann with Hartmann's express written consent. Likewise, Hartmann cannot obligate Vendor without Vendor's express written consent.

**(d)** Vendor shall not assign, transfer or otherwise dispose of this Agreement in whole or in part to any other party, nor shall Vendor subcontract any phase of production of the Ware, or any of its duties under the Agreement, to any other party, without the prior written consent of Hartmann, which may be withheld in Hartmann's sole discretion. Hartmann may assign or delegate to any person all or any of the rights, powers and discretions vested in it by this Agreement and any such assignment or delegation may be made upon such terms and conditions as Vendor in its sole and absolute discretion may determine.

**(e)** No waiver by either party of any provision of this Agreement or of any breach or default shall constitute a continuing waiver of such provision or of any other provisions of this Agreement. If any provision or any portion of this Agreement shall be held to be void or unenforceable, the remaining provisions of this Agreement and the remaining portion of any provisions held void or unenforceable in part shall continue in full force and effect. This Agreement shall be binding upon the parties, their permitted successors and assigns, and it shall be the duty of the parties to notify any such successors and assigns.

**(f)** The warranties, representations and agreements of Vendor under Section 8 and Section 9 of this Agreement shall survive indefinitely following the expiration or termination of this Agreement. All other warranties, representations and agreements of Vendor under this Agreement shall survive for two (2) years following the expiration or termination of this Agreement.

Case 3:09-cv-01206   Document 1-1   Filed 12/22/09   Page 8 of 23 PageID #: 13

(g)     No third parties, other than affiliates of Vendor, are intended to have, nor shall have, any right to benefit from, or to enforce, this Agreement or any of its provisions.

(h)     Section headings are for convenience only and are not to be construed as part of the Agreement.

[Signature page follows]

Case 3:09-cv-01206   Document 1-1   Filed 12/22/09   Page 9 of 23 PageID #: 14

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals the day and year above first written.

**JOHNSON ASSOCIATES CORPORATION**

By: _Jason Vai_

Title: _Executive Vice President_

Date: _July 6, 2007_

**HL OPERATING CORP. d/b/a HARTMANN**

By: _____

Title: _President + CEO_

Date: _July 6, 2007_

**SCHEDULE 2.0**

**BASIC TERMS OF ORDER**

| | |
|---|---|
| 1. Price | For the six-month period beginning with the date of the first Purchase Order delivered to Vendor hereunder, the price for each SKU will be as set forth in such Purchase Order. During the following six-month period and each six-month period thereafter, the price for each SKU during such period will be as set forth in the first Purchase Order delivered to Vendor hereunder during such period. |
| 2. Currency Used for Payment | U.S. Dollars |
| 3. Time of Payment | By no later than 60 days after date of invoice, which shall not be earlier than delivery of shipment documents accompanying the Ware. Payment is subject to Vendor's compliance with the terms and conditions of the Sourcing Agreement, including, but not limited to all specifications relating to the quality of the Ware. |
| 4. Time for Completion of Order | As set forth in Hartmann Purchase Orders. Time is of the essence with respect to delivery of the Ware. |
| 5. Terms of Shipment | As set forth in Hartmann Purchase Orders. |

HARTMANN GENERAL QUALITY SPECIFICATIONS

See Hartmann's General Quality Specifications, a copy of which is attached.

| ![hartmann™ logo] STANDARD PROCEDURE INSTRUCTIONS | TITLE: Hartmann General Quality Specifications Quality Standards – Finished Products - General | | QSP NO 400-1 |
|---|---|---|---|
| | BY: LO/MKY | ISSUED: 11/7/97    REVISED: 5/18/07 | PAGE  11 of 6 |

**PURPOSE:**  To provide the standards for acceptable quality for Hartmann finished products.

**POLICY:**    The following general standards are for Form, Fit, Finish, and Function.  They apply to all products and address "universal" quality standards.  Q.S.P. 402 through 415 will be commodity specific quality standards.

**PROCEDURE:**

**400-1-1  Zippers**
    a)  Zipper slides must operate smoothly: binding or snagging is unacceptable.
    b)  Zipper and zipper tape must be securely caught by stitching.
    c)  Zipper sliders must meet (when zipper slides meet there must be an even amount of zipper teeth showing on each side).  *More than three zipper teeth showing between the slides is unacceptable.*
    d)  Zipper tape margin at main zipper must be uniform within 1/16" across any straight   run.  For corners allow 1/8" maximum.
    e)  Zipper openings should be 1/2" or 3/4" +/- 1/16" as specified by product.
    f)  Zipper installation must be such as to prevent distorting the shape (waviness) of the zipper.
    g)  Zipper slides (all series) should open from left to right.  Unless otherwise noted.

**400-1-2  Handle Hardware (Metal/Plastic)**
    a)  Tarnish, corrosion, or flaking of plating finish is unacceptable.
    b)  Screws and rivets must be free of sharp edges before and after the installation process.  Minor rough or dulled edges are acceptable as long as potential snagging can not occur.

Case 3:09-cv-01206   Document 1-1   Filed 12/22/09   Page 12 of 23 PageID #: 17

c) Screws or rivets must be flush or even with the frame after installation.

d. Screws or rivets must be installed in a manner that does not cause a flaw to the finished product. (example – screws driven in too tight causing leather or material tears would be unacceptable)

e. Screws or rivets may not be installed off-center by more than 1/8".

f. Rivets/snaps must have proper roll-back. Cracks or partial roll-backs are unacceptable. Rivets/snaps must be secure and may turn slightly.

g. Plastic hardware must not have cracks or visible color imperfections (fading or mold defects).

h. Hardware must function properly after installation. (Trolleys, snap hooks, SR buckles, plastic fix locks, locks, and snaps must open /close properly)

**400-1-3   Luggage Tags/Name Tags**

a) a)  Stitch margin must be 1/8"  $\pm$ 1/32"

b) b)  Loose thread ends or tails must not exceed 1/32" on the back side of the luggage tag.  No loose thread end or tail will be allowed on the front (logo portion) of the tag.  Thread ends must be singed and not scissor cut to prevent raveling.

c) Luggage tag buckle must be properly secured.

d) *"hartmann"* logo must be centered +/- 1/16".

e) e)  The outline of the "Hartmann" stamped logo must be clearly defined, with no breaks    or gaps.

**400-1-4   Wheels**

a) Wheels must turn freely without binding/rubbing wheel housings.

b) Wheel Chatter (evident when axle pin and bearing are at improper tolerances) is not acceptable.

**400-1-5   Welt Trim (Spring Wire and Solid Vinyl Welt Trim)**

a) a)  There must be no holes larger than 1/64" or blemishes larger than 1/32" in welt or    trim.

b) Welt cover (tab) should be flush or even with the welt.

c) Welt pin must be installed in welt joint.

d) d)  Welt installation must be such as to prevent distorting the shape (caused by too much welt) or causing puckering (caused by not enough welt) in the product.

**400-1-6   Bindings (leather, vinyl, packcloth, etc.)**

a) Joint ends must be stitched beyond the overlap and flush within 1/32" unless otherwise noted.

b) No raw or loose edge on double fold binding will be allowed.

    c)  Binding should be installed so that the inside surface of the binding touches the material to be bound, i.e., there should not be a gap between the bound surface and the binding.

    **d)  The color of the binding should be consistent with the color/shading of the material of the product being produced.**

## 400-1-7  Stitching

    **a)  For all applications, unless otherwise noted, 7 stitches +/- 1/2 stitch per inch will be acceptable.**

    **b)  No skipped stitches will be allowed on the exterior stitching. Two skipped stitches will be allowed on the interior stitching, however, they must not occur in the same location.**

    **c)  Missing, double, or broken stitches will not be allowed.**

    **d)  No "run off" stitching will be allowed.**

    **e)  Stitch margin must be +/- 1/32" on 1/8" stitches and +/- 1/64" on 1/16" stitches.**

    **f)  Stitch margin must be 3/16" +/- 1/16" on handle saddles.**

    **g)  Knotted stitching is unacceptable.**

    **h)  Thread ends shall be no longer than 1/8".**

    **i)  Any part not "caught" is unacceptable.**

## 400-1-8  Materials (Fabrics/linings)

    *Unacceptable Characteristics:*

  **a)  Excessive fullness or bubble effect in the exterior fabric.**

  **b)  Noticeable pleats which result in a distorted seam.**

  **c)  Noticeable abrasion marks, holes, or flaws resulting from machines, clamps or other holding devices.**

  **d)  Major weaving flaws.**

  **e)  Spots and stains of a permanent nature or those that when removed    leave a "ring" or other surface mark that affects the overall appearance of the product.**

  **f)  Material fraying.**

  **g)  Significant shading differences.**

## 400-1-9  Leathers

    *Unacceptable Characteristics:*

    **a)  Open scars, cuts, and abrasion marks.**

    **b)  Significant, "hard", broken leather.**

    **c)  Surface finish of leather cracking open.**

    **d)  Heavy bruising.**

    **e)  Significant shade differences.**

    **f)  Heavy disease**

**400-1-10 Shoulder Straps**
    a) Stitch margin for leather trim must be 1/8" ± 1/32".
    *b)* Support rivets on the shoulder pad portion of the strap must be set so that there is no contact with the stitching.
    c) Padding for the shoulder portion of the strap must be centered under the top leather covering. Overlap of more than 1/32" will be unacceptable.
    d) The "Hartmann" logo must be legible.

**400-1-11 Hartmann "hartmann" Heat Stamped Logo**
    e) a) The outline of the "hartmann" must be clearly defined and must stand out against the background color.
    f) b) The surface area of the leather must not be burnt, cracked, or have breaks in the leather.
    g) There shall be no breaks or bruises in the leather that will show up in the logo stamp.
    h) There shall be no breaks or bruises in the leather that will show up in the logo stamp.

**400-1-12 Edge inking**
    a) Must be uniform and must completely cover the raw edge. Flaking, peeling, or edge ink running over the edge and onto the leather surface more than 1/32" is unacceptable.

**400-1-13 Gluing**
    a) Adhesion must be a secure bond with no excessive glue showing and no wrinkles, bubbles, or pleats allowed.

**400-1-14 Staples**
    a) Should be fully engaged but not protrude through the finished side.
    b) Should be on the stitch line +/- 1/8".

**400-1-15 Splices**
    a) Leather handle strap trim - only one splice allowed per handle.
    b) Binding - only one splice allowed on each side (front/back) of the bag. The splice must be located on the side or bottom of the bag.
    c) Snap strap/leather pocket trim - no splices allowed.
    d) Splice must be tight and secure with no looseness or curling up of the edges.

**400-1-16 Backtacking**
    a) Must be straight, uniform, and secure.
    b) Must be a minimum of 3 stitches and a maximum of 4 stitches unless otherwise noted.

    **a)** No back tack or overlapping stitches allowed on the logo tag. Thread   ends should be tied off on the backside.

    **b)** The small diamond should be on the right side of the large diamond on the front *(See diagram below)*

    **i)** Panel. When turning the bag, looking at the end gussets and/or the back panel, the small diamond should be on the right side of the large diamond. On mobile travelers, the direction of the small and large diamonds should align with the front panel when looking from the top.  On carry-ons/totes(106), when looking at the front of the bag the top gusset should have the small black diamond to the right side of the larger tan diamond. *(See diagram below)*

    **c)** Diamond pattern should be straight within +/- ¼".

    **d)** Interior webbing strap buckle should loop from the top.

*Small black diamond on right.  Large tan on left with small black diamond inside.*



**General Notes:**

    These standards or guidelines that are established are to <u>enable</u> an employee to consistently make 1st quality product.  As new products are developed they may have specific quality standards related to that product.

    The above General Quality Standards for Finished Products are considered to be <u>minimal</u> quality expectations.   Every attempt should be made to meet or exceed them.  Common sense and good judgment should always prevail when applying these standards during times when a specific issue arises that may not be covered.

    Any flaw in material and/or workmanship that significantly affects the overall appearance of the product shall not be acceptable; keeping in mind, the goal of continuous improvement, the never-ending pursuit of excellence, and becoming

# <u>World Class.</u>

**Definitions:**

    First Quality - Any product that conforms to the expected quality requirements for Form, Fit, Finish, and Function.

Case 3:09-cv-01206   Document 1-1   Filed 12/22/09   Page 16 of 23 PageID #: 21

**Irregular-** Any product that does not conform to the expected quality requirements for Form, Fit, or Finish. Any product deemed an irregular for sale by Hartmann must conform to the functional standards.

**REPORT SIGN-OFF:**    **Marketing:**_____

                                       **Design:**_____

                                       **Sales:**_____

                                       **Quality:**_____

                                       **Manufacturing:**_____

## SCHEDULE 3.1

## ACCEPTABLE QUALITY LEVEL 2.5

See attached.

**SCHEDULE 6.0**

---

**WORKPLACE CODE OF CONDUCT**

**_for HL Operating Corp._**

**2007**

---

This Workplace Code of Conduct (the "Code") for HL Operating Corp. (the "Company") describes the manner in which the Company business is to be conducted. The Company is committed to:

- *A standard of excellence in every aspect of its business.*
- *Compliance with all applicable laws and regulations relating to the manufacture of its products.*
- *Integrity and honesty in dealing with others.*
- *Respect for the environment.*
- *Respect for the rights of individuals.*

The Company selects Suppliers who share its commitment to the aforementioned standards and who comply with the Code. Accordingly, the Supplier hereby affirms that its workplace shall at all times conform to the following standards:

| | |
|---|---|
| **Child Labor** | Suppliers will not use child labor. The term "child labor" means any work performed by a child under the age permitted by the laws, regulations or other requirements of the country in which the product is made. |
| **Involuntary Labor** | Suppliers will not use forced or involuntary labor, whether convict, bonded, indentured or otherwise. |
| **Nondiscrimination** | All employment decisions are to be made on the abilities of employees and not their personal characteristics and/or beliefs. |
| **Women's Rights** | Pregnancy tests shall not be made a condition of employment and pregnancy testing, to the extent provided by Supplier, will be at the option of the worker. Employees shall not be exposed to hazards that may endanger their reproductive health, and employees will not be forced to use contraception. |
| **Coercion & Harassment** | Suppliers will not harass, and will not use corporeal violence or punishment against any employee for any reason. Nor shall suppliers use monetary fines as a form of discipline. |
| **Health and Safety** | Suppliers will provide employees with a safe and healthy workplace in compliance with applicable laws and regulations. At a minimum, Suppliers will ensure reasonable access to potable water and sanitary facilities; fire safety; and adequate lighting and ventilation. |

| | |
|---|---|
| **Compensation** | Suppliers will, at a minimum, comply with applicable wage and hour laws and regulations, including those relating to minimum wages, overtime, maximum hours, piece rates and other elements of compensation. Suppliers will provide their employees with all legally mandated benefits. |
| **Protection of the Environment** | Suppliers will comply with applicable environmental laws and regulations. |
| **Other Laws** | Suppliers will comply with all other applicable laws and regulations relating to the manufacture, sale and distribution of the products made for the Company, including the provisions of the U.S. Foreign Corrupt Practices Act and those laws pertaining to accurate country of origin labeling. |
| **Freedom of Association** | Suppliers shall comply with applicable law regarding the rights of workers to freedom of association and collective bargaining. |
| **Monitoring & Compliance** | Suppliers will authorize the Company and its agents to engage in monitoring activities to confirm compliance with this Code of Conduct. Such activities may include interviews with management and employees, and on-site inspections and audits of facilities. Suppliers will maintain, on site, all documentation that may be required to demonstrate compliance with this Code of Conduct. |
| **Communication** | Suppliers will take appropriate steps to ensure that the provisions of this Code of Conduct are communicated to employees. |

In addition to the foregoing workplace standards, Supplier hereby agrees to the terms and conditions set forth in the Company's Purchase Order, and also to the following:

**Facility/Container Security.** Supplier has developed and implemented written security procedures regarding factory and container security. Such procedures shall ensure that (i) the factory is secure and that only authorized individuals are permitted access thereto; and (ii) the loading and closure of all containers utilized by the Supplier to ship products manufactured for the Company is supervised by management to ensure that no materials other than such products are included in the containers. Supplier shall provide the Company with a copy of these procedures upon request.

**Reduction of Toxics in Packaging Requirements.** Supplier certifies that all packaging and packaging components provided to the Company comply with the requirements of the Reduction of Toxics in Packaging Law, as adopted in New York and certain other states in the United States, namely that the sum of incidental concentration levels of lead, mercury, cadmium and hexavalent chromium present in any package or package component shall not exceed 100 parts per million by weight. Supplier certifies that where the above referenced metals are present at levels below 100 parts per million by weight, such metals were not intentionally added during the manufacturing process.

In consideration for the Company doing business with Supplier, Supplier hereby agrees to comply with the terms of this document. Supplier has read these terms, understands them and agrees to conduct its business in compliance with them.

**Supplier Name:** _____

For Its Facility Located at: _____

Signature: _____

Name: _____. Title: _____

Date: _____

**SCHEDULE 7.0**

**HARTMANN TOOLING AND MOLDS**

**SCHEDULE 11.0**

**PROPRIETARY RAW MATERIALS**

.